**APV BAKER, INC., a Michigan corporation, Plaintiff,**

v.

**HARRIS TRUST & SAVINGS BANK, a foreign corporation, Defendant.**

**No. 1:91–CV–197.**

United States District Court, W.D. Michigan, S.D.

April 11, 1991.

Richard A. Kay, Robert Dale Kullgren, Michelle K. Behaylo, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for plaintiff.

John D. Tully, Warner, Norcross & Judd, Grand Rapids, Mich., for defendant.

## OPINION

HILLMAN, Senior District Judge.

This diversity case returns to the court on motion by plaintiff for preliminary injunction filed five days after the court had denied for lack of ripeness plaintiff's earlier motion for a preliminary injunction after granting a Temporary Restraining Order. Plaintiff, APV Baker, Inc. ("APV Baker"), a Grand Rapids-based manufacturer of baking equipment, again seeks injunctive relief blocking defendant Harris Trust & Savings Bank ("Harris"), an Illinois institu-

tion, from paying a letter of credit to Bank Melli Iran ("Bank Melli"), an Iranian bank. For the reasons set forth below, the court denies the motion.

### Factual and Procedural Background

The prior history of this litigation may also be found in the March 15, 1991, opinion denying plaintiff's previous motion for a preliminary injunction. That opinion was authored by Judge Robert Holmes Bell, a district judge in this district, who graciously agreed to hear and decide plaintiff's motion on behalf of the court while I was holding court in the district's Northern Division.

On September 4, 1975, APV Baker's predecessor, Werner Lehara International ("Werner"), entered into a contract with a branch of the Imperial Government of Iran. The contract was initially between Werner and Iran's "Foreign Transactions Company", but on December 15, 1976, Iran's "State Organization for Grain, Sugar & Tea" substituted as party to the contract.

Under the contract, the Iranian governmental agency agreed to pay Werner $1.56 million to install bakery equipment in Bander Abbas, Iran. The contract stated that Werner would receive payment in increments of 20 percent, 60 percent and 20 percent, with the final payment to be made following installation of the equipment and preliminary acceptance by the Iranian agency. These payments were to be secured by a letter of credit for the value of the contract. It was to be obtained through Bank Markazi, an Iranian bank, for the contract price with Werner designated as the beneficiary.

This contractual arrangement also called for Werner to make a good-faith performance guarantee to the Iranian government, in the amount of 10 percent of the contract price, $156,095. The performance guarantee was to be secured with a standby letter of credit. Werner obtained the letter of credit, No. SP21571, from Harris and, at the request of the Iranian agency, designated Bank Melli as the beneficiary. This letter of credit ("the Harris letter") is the subject of the current litigation.

Under the contract between Werner and the Iranian agency, the Harris letter of credit was to last "twelve months extendable to another twelve months." The contract also provided for the value of the letter to be reduced by 50 percent upon preliminary acceptance and to be eliminated altogether one year after preliminary acceptance. In addition, the contract contained a mandatory forum selection clause designating Iran as the forum for resolution of any contract disputes.

Standby letters of credit, such as the Harris letter, generally function independently of the underlying contractual obligations between Werner and the governmental agency. Standbys that are "clean" letters like the one at issue here are payable to beneficiaries upon demand without any additional documentation or proof required. This form of commercial paper receives frequent use in international transactions. Standby letters of credit permit financial transactions to take place separate from contractual performance. Generally, when a demand on a standby letter of credit is made, the issuing bank pays the beneficiary independently and unconditionally and then seeks reimbursement from its customer. The issuing bank earns a small commission based on the value of the letter.

Although the contract between Werner and the Iranian agency was to have been performed within one year, contractual and financial difficulties developed from the outset. The Iranian government failed to open the letter of credit securing its own performance on the contract by the date initially agreed. As a result, Werner delayed shipment of the machinery and equipment until it received assurance of payment nearly seven months, until September 1975. This delay in shipment allegedly produced additional costs for Werner that have gone unpaid.

Other delays followed. Due to alleged problems with building construction caused by another contractor, the installation of the equipment and machinery was delayed further, leading to several extensions of the contract. In addition, Werner extended the expiration date of the Harris letter of credit on several occasions.

Following negotiations in Germany between Werner and a representative of the Iranian agency in June 1978, a new agreement known as a "process verbal" was made setting forth conditions for completion of the contract. Under the process verbal, Werner was to provide certain technical advice and personnel to make adjustments in the ensuing months. Performance of these final obligations by Werner officials would, in turn, trigger the Iranian agency's preliminary acceptance of the equipment and its payment of the last 20 percent of the contract. As part of this revised arrangement, Werner extended the Harris letter of credit to April 4, 1979.

To date, the contract apparently has not been completed. APV Baker alleges in this action that its predecessor Werner had performed all of its obligations by November 1978. Nevertheless, Werner never received formal preliminary acceptance or the 20 percent balance due on the contract as expected in late 1978, although Iranian officials made alleged assurances in late 1978 that acceptance and payment were imminent. Despite these continued alleged breaches by the Iranian agency, Werner extended the expiration date of the Harris letter of credit again in March 1979; the letter, due to expire April 4, 1979, was extended to October 5, 1981.

Starting in early 1979 and prior to any resolution of these contractual difficulties, revolution engulfed in Iran and radically altered the landscape for commercial transactions between Iran and United States companies. In the ensuing months, the Islamic Republic of Iran toppled the Imperial Government of Iran. The United States Embassy in Teheran was seized and American hostages were captured. Diplomatic and commercial relations between the United States and Iran became severed.

Although no demand for payment had been made under the Harris letter of credit during the initial stage of this tumultuous period, Werner filed suit in this court in April 1979 seeking to enjoin Harris from honoring any future demand by Bank Melli

on the letter of credit. After a hearing on the preliminary injunction motion, I denied injunctive relief, but required that Harris provide Werner three days' notice of any demand for payment. *Werner Lehara Int'l, Inc. v. Harris Trust & Sav. Bank,* 484 F.Supp. 65 (W.D.Mich.1980). The court based its decision, in part, on Werner having failed to show irreparable injury because no demand on the letter of credit had been made. *Id.* at 74.

Following the decision, Werner apparently renewed its attempts to settle the lingering contractual problems. In March 1980, APV Baker asserts, Werner contacted officials at the Iranian Embassy in a futile attempt to discuss the contract. Again, in June 1981, Werner proposed in a telex communication to meet with Iranian officials in London, but received no response. In October 1981, the Iranian government again allegedly failed to respond to a telex proposing a settlement conference.

Werner's difficulties involving the contract and letter of credit were not isolated concerns during this period. By 1980, dozens of lawsuits had been initiated nationwide to enjoin payment on letters of credit associated with Iranian government contracts. *See* Getz, *Enjoining the International Standby Letter of Credit: The Iranian Letter of Credit Cases,* 21 Harv. Int'l L.J. 189 (1980); Zimmett, *Standby Letters of Credit in the Iran Litigation: Two Hundred Problems in Search of a Solution,* 16 Law and Policy in Int'l Bus. 927 (1984).

The issue of the fate of outstanding Iranian letters of credit extended beyond the courts. In response to an executive order by President Carter that blocked the transfer of all Iranian assets in the United States, the Treasury Department in 1979 issued the Iranian Assets Control Regulations, 31 C.F.R. Part 535. These regulations expressly set forth procedures for U.S. banks that received demands from Iranian beneficiaries on letters of credit. 31 C.F.R. § 535.568. The regulations provided for the payment of any demands into blocked accounts established through licenses issued by the Treasury Department

and set up on the books of the issuing banks or the banks' customers. *Id.*

Under these regulations, the bank that issued the standby letter of credit had to give prompt notice to its U.S. customer of a demand by an Iranian beneficiary. § 535.568(b). Then, payment by the bank of the demand into a blocked account was prohibited until eight business days after the giving of such notice. *Id.* After receiving notice, the customer had five business days to apply for a license with the Treasury Department that would authorize it to establish a blocked account on its own books, instead of payment into a blocked account by the issuing bank and reimbursement by the customer.

These regulations came into play in this matter in August 1981, when Harris received a telex and a letter from Bank Melli requesting another extension of the letter of credit or, in the alternative, demanding payment on the letter of credit. Although there is disagreement between APV Baker and Harris regarding the dates of some of the actions that followed, it is undisputed that Werner applied for and received a license to set up a blocked account on its own books for the letter. On September 2, 1981, Werner certified the establishment of its blocked account for this purpose, and on September 22, 1981, Harris notified Bank Melli that it was unable to effect payment as directed.

The status of the Harris letter of credit remained unchanged for nearly 10 years. APV Baker, as Werner's successor, maintained a blocked account on its books for Bank Melli in the amount of $156,095.

However, in February 1991, the Treasury Department announced the revocation of licenses establishing these accounts for standby letters of credit owed to Iranian beneficiaries. 56 Fed.Reg. 6546 (Feb. 15, 1991). Effective February 28, 1991, nearly all blocked-account licenses, including the one held by APV Baker were revoked. *Id.* This change was the result of a recent decision by the Iran–U.S. Claims Tribunal in The Hague finding that the blocked accounts effectively freezing Iranian assets

violated provisions of the Algiers Accords. *Id.*

Following this development, APV Baker returned to this court once again seeking injunctive relief blocking payment of the letter of credit to Bank Melli by Harris. In moving for a preliminary injunction, APV Baker contended that payment of the standby letter of credit would be fraudulent and thus barred under prevailing commercial law because it had completed performance on the contract that the letter secured. In support of its motion, the manufacturer supplied affidavits from company officials attesting to its complete performance on the contract and pointed to cases from other circuits granting injunctions on standby letters of credit due to "fraudulent" demands by Iranian banks.

Judge Bell denied APV Baker's motion for a preliminary injunction, finding that APV Baker had failed to show a threat of immediate, irreparable harm. The record, as understood by Judge Bell, did not disclose a current demand had been made on the Harris letter by Bank Melli. *APV Baker, Inc. v. Harris Trust & Sav. Bank*, No. 1:91–CV–197, (W.D.Mich., March 15, 1991), op. at p. 6. Judge Bell also ordered Harris to provide APV Baker with notice of any new demand for payment and three days' notice prior to any payment. Op. at p. 10.[1]

On March 20, 1991, five days after Judge Bell had denied the motion, APV Baker returned to court with another motion for preliminary injunction and amendments to its original complaint due to changed circumstances. On March 19, 1991, Harris, through its counsel, had notified APV Baker that it considered Bank Melli's 1981 demand to still be in effect and that it intended to pay the demand on March 22, 1991.

Based on these developments, APV Baker renewed its request for injunctive relief preventing payment on a demand that it alleges is fraudulent. In addition, for the first time, APV Baker now argues that payment would be improper because the Bank Melli demand had been dishonored by Harris in 1981. Consequently, it is claimed by APV Baker that the letter of credit expired in 1982.

After a meeting with counsel, the court granted a Temporary Restraining Order pursuant to Fed.R.Civ.P. 65(b) on March 22, 1991. On March 27, 1991, the court held a hearing on the preliminary injunction motion. And on March 29, 1991, the court extended the temporary restraining order for an additional ten days, to April 11, 1991, pursuant to Fed.R.Civ.P. 65(b).

In summary, APV Baker claims that the circumstances in this case are now appropriate for a preliminary injunction preventing the imminent payment of a fraudulent demand. Alternatively, APV Baker urges that injunctive relief is appropriate because Harris is planning to honor a demand that APV Baker maintains was dishonored soon after it was made.

In opposing preliminary injunction and seeking dismissal of the complaint, Harris asserts that the narrow fraud exception to the general rule requiring payment on demand for a letter of credit does not apply to allegations regarding the underlying contract, such as those made by APV Baker. In addition, Harris contests APV Baker's claims that the demand has been dishonored and the letter of credit has expired. Harris also argues that the complaint should be dismissed because Bank Melli, which is not a party, is indispensable under Fed.R.Civ.P. 19(b) as the bank making the allegedly fraudulent demand.

---

**1.** Harris has filed a "motion for correction of record and, if appropriate, for reconsideration" based on the March 15, 1991, opinion. In its motion, Harris requests that the court correct the record to the extent that the March 15, 1991, opinion states that Harris or its counsel had conceded that the bank does not presently consider a demand to have been made. *See* March 15, 1991, opinion at p. 6 and 8. In fact, Harris asserts that Bank Melli has made an existing demand conforming to the conditions of the letter of credit, which Harris intends to pay. The court accepts Harris's assertion that it considers a valid demand to exist. The court hereby corrects the record to reflect that no concession or suggestion by Harris that a demand did not exist was made or intended. Therefore, the court grants Harris's motion to correct the record. This opinion addressing the present motion for preliminary injunction makes Harris's additional request for reconsideration moot.

## Standard

A preliminary injunction is an extraordinary remedy under any circumstance. The four factors to be considered by a district court in deciding whether to grant a preliminary injunction are: 1) whether plaintiff has shown a strong or substantial likelihood of success on the merits; 2) whether plaintiff has shown irreparable harm; 3) whether issuance of a preliminary injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing a preliminary injunction. *Id.* at 1123 (*quoting Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982)).

The factors serve as a guide without establishing a rigid test. While recognizing the need for flexibility, however, the Sixth Circuit has emphasized that a showing of irreparable harm by the plaintiff is paramount: "[T]his court has never held that a preliminary injunction may be granted without any showing that the plaintiff would suffer irreparable injury without such relief ... [E]quity has traditionally required such irreparable harm before an interlocutory injunction may be issued." *Friendship Materials v. Michigan Brick, Inc.,* 679 F.2d 100, 102–03 (6th Cir.1982) (citations omitted).

## Discussion

Irreparable Harm

■ Since Judge Bell's March 15, 1991, opinion, Harris has notified APV Baker that it intends to honor Bank Melli's 1981 demand. That payment has been forestalled by the temporary restraining order currently in effect. Due to these new developments, it is appropriate to reconsider whether plaintiff has shown irreparable harm.

It is still true, as Judge Bell noted, that the record in this matter is devoid of any demand for payment from Bank Melli since 1981, including the several weeks since the federal regulations expressly barring such payment were lifted. Nevertheless, Harris' unequivocal notification that it intends to honor the decade-old demand with payment clearly places APV Baker in immedi-

ate risk of damages: Should Harris honor the demand with payment, it would certainly turn to its customer, APV Baker, for reimbursement.

Once payment by Harris is made, APV Baker contends, it will lack an adequate remedy at law against the Iranian government for obtaining payment on this performance guarantee despite Werner's completed performance. APV Baker points to the contract clause mandating selection of Iran as the forum for litigating any contract disputes, which appears to preclude an action against any potential Iranian defendants in U.S. courts. Past hostility to Westerners and, in particular, Americans in Iran is well-documented. *See Itek v. First Nat'l Bank,* 730 F.2d 19, 22 (1st Cir.1984) ("The recent history of relations between Iran and the United States indicates that remedy is inadequate."); *Rockwell International Systems, Inc. v. Citibank, N.A.,* 719 F.2d 583, 588 (2d Cir.1983); *Harris Corp. v. Nat'l Iranian Radio and Television,* 691 F.2d 1344, 1356–57 (11th Cir. 1982) ("It is clear that the Islamic regime now governing Iran has shown a deep hostility toward the United States and its citizens, thus making effective access to Iranian courts unlikely.") APV Baker contends that, despite some evidence of improved diplomatic relations between the United States and Iran, no real prospects exist for litigating a case in Iran due to political conditions and Iranian procedural law, which would probably consign the dispute to an administrative board of the government.

APV Baker also asserts that it does not have open to it the alternative forum available to many other companies involved in Iranian letters of credit disputes, the U.S.–Iran Claims Tribunal. APV Baker claims it does not satisfy two of the criteria necessary to obtain jurisdiction in the tribunal, an assertion Harris does not dispute. As a corporation that was acquired by a British holding company in September 1978 and that is less than half-owned by United States citizens, APV Baker says it does not qualify as a "U.S. national" entitled to access to the tribunal.

In light of the foregoing, the court finds that APV Baker has shown that it will lack recourse against the Iranian government in the event that the government unjustly receives payment on the letter of credit. The company has made an adequate showing of the threshold requirement of immediate threat of injury without an adequate remedy at law to merit consideration of the other preliminary injunction factors.

Nevertheless, it is worth noting that the unavailability of remedies is the result of APV Baker's own actions. The mandatory forum selection clause is part of a contract that Werner chose to enter. The obstacles to jurisdiction for the claims tribunal are indirect results of an acquisition that APV Baker freely elected to make. In the balancing of factors that is required when determining a preliminary injunction motion, these reasons for the lack of an adequate remedy at law carry reduce to some degree the weight to accord this showing of irreparable harm.

Likelihood of success on the merits

■ Under section 5–114 of the Uniform Commercial Code, letters of credit are payable on demand unless the demand is "... is fraudulent or there is fraud in the transaction...." *See* M.C.L.A. § 440.5114; Ill. Ann.Stat., ch. 26 ¶ 5–114.

In its amended complaint seeking an injunction based on fraud, APV Baker relies on evidence in the record indicating that it has fully performed on the contract and made a series of attempts at obtaining preliminary acceptance and the balance due from the Iranian government. Harris does not contest this evidence, but it stresses that, as the issuing bank, it is merely a stakeholder on a letter of credit that, by definition, does not concern itself with contractual performance.

In attempting to determine the likelihood of success on this fraud theory, the court must first determine the breadth of the exception to the general rule that "clean" letters of credit like the one at issue here are automatically paid. The central question is whether the "fraud in the transaction" exception applies to fraud in the underlying transaction between the customer and the beneficiary and, if so, whether it should apply in this case.[2]

The Code does not define "fraud in the transaction." However, several aspects of the Official Code Comment for section 5–114 suggest to the court that a narrow interpretation is appropriate, restricting the fraud inquiry to the credit transaction, rather than the underlying contract to which the issuing bank is not a party. Comment 1 states: "The letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as independent of the underlying contract between the customer and the beneficiary.... [T]he issuer is under a duty to honor the drafts or demands for payment which in fact comply with the terms of the credit without reference to their compliance with the terms of the underlying contract." U.C.C. § 5–114, comment 1. Comment 2 states, in part, that "the risk of fraud in the transaction [is] placed upon the customer." U.C.C. § 5–114, comment 2. Comment 2 also makes clear that the issuer is guided by a duty of good faith. *Id.*

A narrow interpretation of the fraud in the transaction exception has been widely adopted by courts and commentators. The Sixth Circuit has recognized "[t]here is

---

**2.** UCC Section 5–114 provides, in relevant part:

(1) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.... (2) Unless otherwise agreed when documents appear on their face to comply with the terms of credit but a required document ... is forged or fraudulent or there is fraud in the transaction

(a) the issuer must honor the draft on demand for payment if honor is demanded by ... a holder in due course ...; and

(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.

M.C.L.A. § 440.5114; Ill.Ann.Stat., ch. 26 ¶ 5–114.

only limited authority for enjoining payment under a letter of credit when the documentation is fraudulent or there is 'fraud in the transaction.' " *Warner v. Central Trust Co.*, 715 F.2d 1121, 1123 (6th Cir.1983) (citing *KMW Int'l v. Chase Manhattan Bank*, 606 F.2d 10, 16 (2d Cir. 1979)). In addition, the Sixth Circuit has indicated that fraud is a limited principle in which "the underlying contract should not be looked to" because section 5–114 "seems to cover fraud in the factum and not fraudulently calling the letter of credit." *Bossier Bank & Trust Co. v. Union Planters Nat'l Bank*, 550 F.2d 1077, 1082 (6th Cir. 1977) (per curiam) (adopting district judge's memorandum decision). *See also* 7 Anderson, *Uniform Commercial Code* § 5–114:7 ("In view of the fact that the underlying transaction is to be ignored in a letter of credit transaction, it should be held that fraud as between the beneficiary and the customer with respect to the underlying contract should be ignored."); Note, *Standby Letters of Credit: Recent Limitations on the Fraud in the Transaction Defense*, 35 Wayne L.Rev. 119, 151 (1988).

A number of courts have settled on an interpretation of "fraud in the transaction" that limits it to egregious circumstances in which the fraud effectively destroys the original purpose of the independent letter-of-credit transaction. *See, e.g., Stringer Construction Co. v. American Ins. Co.*, 102 Ill.App.3d 919, 58 Ill.Dec. 59, 64, 430 N.E.2d 1, 6 (1981) (fraud must have "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served") (*citing Intraworld Indus., Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316, 324–25 (1975); *Audio Systems, Inc. v. First Nat'l Bank*, 753 S.W.2d 553, 555 (Ky App.1988) (fraud in the transaction has been found to exist only "in the most egregious circumstances"); *Colorado Nat'l Bank v. Board of County Commissioners*, 634 P.2d 32, 39 (Colo.1981) (en banc); *GATX Leasing Corp. v. DBM Drilling Corp.*, 657 S.W.2d 178, 182 (Tex.App.—San Antonio, 1983) ("The standard for enjoining a letter of credit for fraud is nothing less than fraud that destroys the legitimate

purposes of the letter of credit's independence from the underlying obligation.").

In seeking denial of the present motion, Harris relies on this line of cases narrowly construing "fraud" to the most extreme circumstances. APV Baker, however, urges the court to follow several courts that have enjoined payment of Iranian letters of credit in situations where performance of underlying contractual obligations were considered. In particular, APV Baker relies on *Itek Corp. v. First National Bank*, 566 F.Supp. 1210 (D.Mass 1983), *aff'd*, 730 F.2d 19 (1st Cir.1984); *Rockwell International Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583 (2d Cir.1983); and *Wyle v. Bank Melli*, 577 F.Supp. 1148 (N.D.Cal. 1983).

These cases involved demands made by an Iranian bank on standby letters of credit similar to the one in this action. The courts found fraud in the transaction due, in part, to evidence of completed performance or good-faith attempts to do so by the American company. *Itek*, 730 F.2d at 28; *Rockwell*, 719 F.2d at 589; *Wyle*, 577 F.Supp. at 1153–54. Thus, the courts examined the contractual circumstances between the customer and beneficiary when assessing "fraud in the transaction."

APV Baker urges the court to follow suit here. In light of the evidence of APV Baker's performance and its subsequent overtures to the Iranian government that elicited no response, APV Baker asserts, it is appropriate for the court to conclude that there is a substantial likelihood that Bank Melli's 1981 demand is fraudulent. I decline to do so for several reasons.

■ First, and most importantly, the court concludes that section 5–114's fraud exception is limited to fraud in the credit transaction except when extraordinary circumstances vitiate the independent function of the letter of credit altogether. After careful consideration of section 5–114 and leading cases, and in the absence of controlling authority dictating otherwise, I conclude that this narrow fraud exception is necessary to give section 5–114 and the standby letter of credit their proper mean-

ing and commercial utility. To the extent this holding conflicts with decisions in other circuits, I respectfully disagree.

Based on the record in this case, I find that APV Baker does not have a substantial likelihood of success on its fraud claim. The manufacturer has advanced no evidence of fraud in the credit transaction, and the circumstances surrounding the demand do not support a finding that the independent function of the letter of credit in this case has been altogether vitiated. In fact, APV Baker acknowledges that whether Bank Melli, the beneficiary on the credit, "has any culpability, at the present, is unclear and speculative." Plaintiff's Brief in Support of Motion for Preliminary Injunction, March 6, 1991, at p. 16.

The evidence upon which APV Baker makes its fraud claim is limited solely to circumstances surrounding its contractual difficulties with the Iranian governmental agency, not the Iranian bank that is the beneficiary on the Harris letter. As a result, the court cannot find a likelihood of fraud in the independent letter-of-credit transaction itself. The fraud alleged here is limited to the contract.

A second reason for the court's decision not to follow courts that have found a substantial likelihood of fraud in other Iranian cases is the absence of any Iranian defendant in this action. In each of the cases relied upon by APV Baker, an Iranian entity was a party. In this matter, the court would be severely disabled in an attempt to reach the merits of a fraud claim without the benefit of Bank Melli's or another Iranian party's explanation of the circumstances surrounding the 1981 demand, with no prospect for APV Baker's allegations being controverted. Bank Melli itself was a named defendant in *Wyle* and *Itek* in the early 1980s, and in another Iranian letter of credit case as recently as 1989. *See El Indus. Int'l v. Continental Illinois Nat'l Bank*, No. 81 C 5773, 1989 WL 2066 (E.D.Ill.1989) (available on Lexis). The absence from this litigation of the bank or any other Iranian party is conspicuous.

A third reason for distinguishing this action from other cases finding a substantial likelihood of fraud is APV Baker's own actions with respect to the Harris letter of credit. On several occasions, APV Baker agreed to extend the expiration date of the Harris letter, apparently in an ongoing effort to keep alive this commercial venture and the prospect of receiving full payment. Even in March 1979, after the beginning of the Iranian revolution and despite what it claims was full performance, the manufacturer extended the full amount of the letter of credit another 18 months, to October 5, 1981. It was during the last of these several extensions that the demand from Bank Melli was made. In light of the APV Baker's decisions to extend the letter of credit despite ongoing contractual difficulties and revolutionary turmoil, it seems particularly inappropriate to determine that the 1981 demand is fraudulent due to evidence of contractual breaches, exonerating APV Baker from financial responsibility.

Substantial Harm to Others

If an injunction were to be issued in this matter, Harris contends it would face the risk of substantial harm. Harris asserts that failure to honor the demand on a clean letter of credit would adversely affect its reputation in the international banking community. In addition, Harris could be exposed to litigation initiated by Bank Melli or to seizure of assets in other jurisdictions. These risks have been well recognized in other cases considering the propriety of injunctions based on claims of fraud in letter of credit transactions. *See, e.g., KMW Int'l v. Chase Manhattan Bank*, 606 F.2d 10 (2d Cir.1979); *American Bell Int'l, Inc. v. Islamic Republic of Iran*, 474 F.Supp. 420 (S.D.N.Y.1979).

In balancing the equities between the parties, it also appears to the court that APV Baker should bear the consequences of entering into the underlying agreement with the Iranian government. As the court noted in ruling on the initial motion for preliminary injunction eleven years ago, "when the plaintiff undertook to do business in Iran, ... it subjected itself to the risks of revolution, political upheaval, in-

surrections, wars, and the like." *Werner Lehara*, 484 F.Supp. at 75. *See also* Werner's Application for Letter of Credit at ¶ 5 ("The users of the Credit shall be deemed our agents and we assume all risk of their acts or omissions."); UCC 5–114, comment 2 ("The risk of the original bad-faith action of the beneficiary is thus thrown upon the customer who selected him rather than upon innocent third parties or the issuer. So, too, is the risk of fraud in the transaction placed upon the customer."). Placing the equitable burden on APV Baker also seems appropriate in light of its repeated decisions to amend its original contractual relationship.

In light of all these considerations, the court finds that an injunction would improperly and harmfully shift the risk of this particular business transaction to the issuing bank, with the additional threat of adverse consequences to others in the international business community.

Public Interest

An injunction in this matter might also have harmful reverberations beyond the parties in this case that would not serve the public interest. Under the circumstances of this case, making an exception to the narrow fraud in the transaction rule could reduce the effectiveness of the standby letter of credit in international commercial transactions. It could lead to an erosion in the utility of the device in an international business community that frequently experiences disruption due to political turmoil. One need only survey recent, dramatic changes in political conditions in the Middle East, Eastern Europe, China and the Soviet Union to imagine how the absence of reliable, independent letters of credit could retard international commerce and development. *See* Zimmett, *Letters of Credit in the Iran Litigation: Two Hundred Problems in Search of a Solution*, 16 Law & Policy in Int'l Business 927, 962 (1984) ("These *ad hoc* remedies may have achieved an expedient result, but over time they erode established law that has supported wide acceptance of U.S. bank credits abroad.")

Dishonor and expiration of the letter of credit

In an alternative argument that it raises for the first time in the present motion for preliminary injunction, APV Baker contends that an injunction against payment of the demand should be issued because the demand was dishonored. In addition, the manufacturer argues, the credit expired by its own terms in October 1981, which means a new or renewed demand cannot be made. APV Baker bases its claims on interpretations of the general UCC rule that letters of credit must be honored or rejected within three days and the provisions of the special Iranian Assets Control Regulations. *See* UCC § 5–112(1); 31 C.F.R. § 535.568.

Even assuming that APV Baker's new arguments are correct, the facts as alleged would militate against a preliminary injunction, rather than in favor of one. Under this new scenario, the threshold requirement of irreparable harm would once again be absent from this matter. Put simply, no imminent threat of payment on a demand would exist if the demand had been dishonored and the letter itself had expired. In the event that Harris made a payment to Bank Melli under this scenario, it would do so at its own risk. APV Baker then would have a valid defense against its obligation to reimburse Harris for payment. Either party could seek remedy in an American court for any contract dispute that might arise between them.

Because these new arguments are not probative for APV Baker's request for preliminary injunctive relief in this matter, I decline to reach their merits. Nevertheless, the court notes in passing that APV Baker's decision to maintain a blocked account on its own books for the last ten years in the amount of the allegedly dishonored demand plus its failure to make these allegations before raises at least some question about the validity of these new claims advanced by APV Baker.

*Conclusion*

In light of the foregoing consideration of the factors to be weighed in a motion for

preliminary injunction, the court denies plaintiff's motion for preliminary injunction and dissolves the Temporary Restraining Order that has been in effect. I conclude that APV Baker has failed to show a substantial likelihood of success on its claim of fraud. In addition, I find that the other equitable factors weigh in favor of Harris.

The court shall refer this matter to Magistrate Judge Scoville for a pretrial conference pursuant to Fed.R.Civ.P. 16(a). At the Rule 16 conference, counsel shall be prepared to discuss whether Bank Melli is subject to service and joinder in light of Harris' pending motion to dismiss for failure to join an indispensable party under Fed.R.Civ.P. 19(b).